**Julie Ann GILES, Plaintiff-Appellant,**

v.

**Richard (Dick) J. ACKERMAN, Sheriff of Bonneville County, et al., Defendants-Appellees.**

No. 83–3751.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1983.

Decided Nov. 2, 1984.

Stephen L. Pevar, American Civil Liberties Union, Denver, Colo., Larry Goins, Hopkins, French, Crockett & Springer, Idaho Falls, Idaho, for plaintiff-appellant.

Lynn J. Lund, Bountiful, Utah, for defendants-appellees.

Before BROWNING, Chief Judge, HUG and TANG, Circuit Judges.

PER CURIAM:

This case concerns the constitutionality of the Bonneville County Jail policy to subject persons booked into the county jail on minor traffic offenses to a strip search. After her arrest for a traffic violation, Julie Giles was strip searched by an official at the Bonneville County Jail in Idaho Falls, Idaho. The search was conducted pursuant to a jail policy requiring that all persons booked into the jail be strip searched. The officer who searched Giles had no individualized suspicion that Giles was carrying contraband or that she in any way threatened jail security.

We hold that arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease. Because no such suspicion existed in Giles's case, the officer who searched Giles violated her rights under the fourth amendment.

## I

The parties stipulated to the following facts. Giles was stopped by a sheriff's deputy in Idaho Falls, Idaho because her vehicle registration had expired. A routine computer check revealed that an arrest warrant had been issued for Giles because of several outstanding parking tickets.[1] The officer arrested Giles and placed her in the patrol car. He described her as cooperative and neither frisked her nor inspected the purse she carried.

Giles was taken to the Bonneville County Jail. She waited approximately twenty minutes and was allowed to move freely around the building. During this period, jail officials did not handcuff Giles, frisk her, or subject her to a pat down search. She was permitted to keep her purse, which was not searched.

Giles was unable to post a bond immediately because she did not have sufficient cash with her and could not reach her husband. She was booked into the jail, and in compliance with county policy she was required to remove her clothes and was strip searched. Within a few hours of her arrest, Giles posted bond and was released.

Giles brought this action against the sheriff, the county, and the county commissioners (collectively, "the County") under 42 U.S.C. § 1983. She claimed enforcement of the jail policy requiring that all arrestees be strip searched had violated her fourth amendment rights. She sought a declaration that the policy was unconstitutional, an injunction against its continued enforcement, and damages.

After considering cross-motions for summary judgment, the district court granted judgment for the defendants. *Giles v. Ackerman*, 559 F.Supp. 226 (D.Idaho 1983). The court held that the strip search did not violate Giles' constitutional rights. We reverse.

## II

Section 501.03(5) of the jail's Policies and Procedures Manual provides as follows:

knowledge of them.

---

**1.** Giles indicates that the parking tickets were issued to her husband and that she had no

The subject will then be placed in the booking cell, and all items and clothing removed, strip searched, and all property receipted for on the arrest record.

The policy is applied to all male and female arrestees who are to be placed in the general jail population. Jail personnel are given instructions on the conduct of the search. The instructions require a visual examination of body cavities. In Giles's case, however, the officer did not follow these instructions, but limited her examination to a skin search. Giles contends the skin search violated her fourth amendment rights. She also claims that the cavity search policy is unconstitutional on its face.[2]

The County argues that the warrantless strip search of Giles was lawful because it was incident to her arrest. It relies on *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), which held that a "full search of the person" incident to arrest is per se reasonable under the fourth amendment. *Id.* at 235, 94 S.Ct. at 477. However, the "full search" in that case was limited to a pat down and an examination of Robinson's pockets. The search involved no strip search or bodily intrusion, and nothing in the opinion implies that the court intended "full search" to include such intrusions. That implication would be inconsistent with *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), which held the fourth amendment protected an arrestee's privacy interests and thus barred intrusions into the body "which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768, 86 S.Ct. at 1834. The taking of a blood sample from Schmerber was not authorized as incident to his arrest, but required independent justification. *Schmerber* thus implies that intrusions into the arrestee's body, including body cavity searches as authorized by the County's policy, are not authorized by

arrest alone. *See* 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 5.3(c) (1978). Similarly, we see nothing in *Robinson* or *Schmerber* that authorizes the somewhat less intrusive strip search as incident to arrest. *Accord Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1271 (7th Cir.1983).

The County next contends the policy is authorized by the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Bell*, pretrial detainees housed in a custodial facility challenged a policy requiring all inmates to submit to strip searches following contact visits with persons from outside the institution. The policy was designed to prevent visitors from smuggling weapons and contraband into the facility. The Court characterized the issue raised by the inmates' challenge to the policy as "whether visual body cavity inspections ... can *ever* be conducted on less than probable cause." *Id.* at 560, 99 S.Ct. at 1885 (emphasis in original). To resolve this issue, the Court balanced the security interests of the institution against the privacy interests of the inmates. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. at 1884. Applying those factors, the Court in *Bell* concluded that a standard less stringent than probable cause could justify strip searches or body cavity searches of inmates at a pretrial detention facility. *Id.* at 560, 99 S.Ct. at 1885.

We reject the County's contention that *Bell* signifies that all strip searches are constitutionally acceptable. Instead, *Bell* employed a mode of analysis developed by the Court in *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979):

we hold that reasonable individualized suspicion is required before a strip search may be lawfully conducted, it is obvious that even more intrusive body cavity searches would require no less.

---

**2.** As the district court pointed out, it is not necessary to consider whether the County's policy was constitutional as applied to body cavity searches since Giles' body cavities were not searched. 559 F.Supp. at 228. However, since

Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test. (Footnotes omitted.)

We must therefore balance the security needs of local jail facilities against the privacy interests of arrestees charged with minor offenses to determine what objective standard authorizes strip searching of arrestees. *See Mary Beth G.*, 723 F.2d at 1273; *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982).

The parties do not dispute the nature of the intrusion. They agree that Giles's privacy was invaded in a frightening and humiliating manner. They also agree that the search was conducted in an appropriate place and "with all due courtesy." At issue is the County's justification for the search policy.

The inmates in *Bell* were charged with offenses more serious than minor traffic violations, and they were therefore detained for substantial pretrial periods. The Court observed that smuggling of drugs, weapons, and other contraband into the facility was common. *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884. The institution's strip search policy was designed to deter inmates from receiving contraband from visitors. *Id.; see also Block v. Rutherford*, —— U.S. ——, 104 S.Ct. 3227, 3231, 82 L.Ed.2d 438 (1984). Officials at the facility had established that smuggling of contraband constituted a serious risk to inmates and employees and had shown the policy was an effective deterrent. *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884.

In contrast, the County has not demonstrated that its security interests warrant the serious invasion of privacy inflicted by its policy. The record reveals that the incidence of smuggling activity at the Bonneville County Jail is minimal. Evidence before the trial court indicates that of approximately 3,500 persons searched at the jail in the preceding 18-month period, only eleven persons had concealed anything that warranted a report, including the concealment of cigarettes. Defendants cite as significant only one discovery in the course of 3,500 strip searches: a knife was found cradled in the small of the back of an arrestee. Defendants also cite two instances from other parts of the country (California and Mississippi) in which matches were concealed on the person of detainees.

Moreover, there is no indication whatsoever that the County's strip search policy could or did have any deterrent effect. Visitors to the detention facility in *Bell* could plan their visits and organize their smuggling activities. In contrast, arrest and confinement in the Bonneville County Jail are unplanned events, so the policy could not possibly deter arrestees from carrying contraband.

We acknowledge the difficult security problems present in some local jail facilities. We recognize also that we are not free to substitute our views on proper jail administration for that of the jails' actual administrators. *Block*, 104 S.Ct. at 3232. We conclude, however, that strip searching of every arrestee booked into the Bonneville County Jail is not necessary to protect the institution's security interest. Balancing that interest against the privacy interests of arrestees, we hold that arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband. Reasonable suspicion may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record. *See generally Mary Beth G.*, 723 F.2d at 1273; *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir.1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Hunt v. Polk County*, 551 F.Supp. 339, 342–45 (S.D. Iowa 1982); *Smith v. Montgomery Coun-*

*ty,* 547 F.Supp. 592, 598–99 (D.Md.1982); *Tinetti v. Wittke,* 479 F.Supp. 486, 490–91 (E.D.Wis.1979), *aff'd.* 620 F.2d 160 (7th Cir. 1980).

This more limited use of strip searches will protect the privacy interests of arrestees who pose no security threat to the facility, but will enable jail officials to identify and search those who may pose such a risk. Of course, the County remains free to enhance its security by implementation of procedures that are less intrusive than strip searches, including the use of pat down searches and metal detectors and the segregation of inmates to isolate arrestees for minor offenses from the general jail population.

Applying this standard to Giles's claims, we hold the search violated her rights under the fourth amendment. No suspicion existed that Giles was carrying contraband. Her offense was minor and was related neither to drugs nor to weapons. She had no prior record. Both the arresting officer and the officer who conducted the search indicated Giles was cooperative and orderly. The officer who strip searched Giles stated she would not have conducted the search had the policy not required it, and she limited the scope of the search because Giles's appearance and demeanor convinced the officer that no contraband would be found.[3] Weighing the intrusiveness of the strip search against the minimal showing of need we conclude that the indiscriminate search of Giles violated her fourth amendment rights.

*Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), applied *Bell* to a very similar county jail strip search policy and arrived at the same conclusion. Logan was arrested for drunk driving and for refusal to take a breathalyzer test without first being allowed to contact her attorney. She was transferred to the detention center where she repeated her request to contact her attorney. In accordance with county policy she was allowed the phone call only after she had been strip searched. The Fourth Circuit held the strip search policy "conclusively ... unconstitutional under the standards laid out in *Bell v. Wolfish,* 441 U.S. 520 [99 S.Ct. 1861, 60 L.Ed.2d 447] ...." 660 F.2d at 1013. The court continued:

> Strip searches of detainees are constitutionally constrained by due process requirements of reasonableness under the circumstances ... Logan's strip search bore no such discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified.

*Id.*

The *Logan* court noted that Logan's offense—more serious than that of Giles— "was nevertheless one not commonly associated by its very nature with the possession of weapons or contraband; ... when strip-searched she had been at the Detention Center for one and one-half hours without even a pat-down search." *Id.* Although Giles was placed in the general jail population and Logan was not, another court has correctly pointed out that

**3.** Officer Shumway testified on deposition as follows:

> Q Would you have strip searched Julie if you were not compelled to by the Policies Manual?
> A If we weren't compelled to, no, I probably would not have. If we'd had a facility which she could have gone in in her clothes; if we had that type of facility for people, where they could go in in their own clothing, there would be no problem at all.
> Q Okay, I have two questions based on what you just said. Number one, why wouldn't you have strip searched her if you didn't have to, what is it about Julie?

> A She was well dressed. She was clean and neat. Her charges weren't the type—you know, like I said, if we had a facility for that type of charge and for the minor people, it would be no problem.
> Q So you consider the nature of the charge in considering whether a strip search is advisable, among other considerations?
> A This would be the hypothetical thing that I am saying. Not with our policies and procedures it doesn't matter—
> Q Yes, I understand.
> A But if it were a case of whether you could or you couldn't, I would not have strip searched Julie Giles, no, because of the charges and from everything considered.

"[d]efendants' heavy reliance on the intermingling of its temporary detainees with the general [jail] population is misplaced ..." because such intermingling is both limited and avoidable. *Smith v. Montgomery County,* 547 F.Supp. at 598–99.

### III

Our conclusion that Giles's constitutional rights were violated requires us to reverse the summary judgment for the defendants and to remand the case for trial and determination of a remedy. As to the individual defendants, there remain substantial questions of fact to be determined at trial concerning their liability and potential defenses of immunity and good faith. As to the County, it is apparent from our holding that the violation of Giles's constitutional rights was a result of a fixed policy of the County. The liability of the County has thus been established as a matter of law. The remaining questions are the amount of damages to which Giles is entitled and whether injunctive or declaratory relief should be granted.

Giles's request for injunctive and declaratory relief does not raise the issue of standing considered by the Supreme Court in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *Lyons* the plaintiff's damages claim had been severed from his claim for injunctive relief. 461 U.S. at —— n. 6, 103 S.Ct. at 1667 n. 6. The Court was thus required to consider whether his request for an injunction, standing alone, presented a case or controversy. *Gonzales v. City of Peoria,* 722 F.2d 468, 481–82 (9th Cir.1983). In contrast, it is clear that Giles has standing to bring her damages action, and there is no question that a live controversy exists between her and the County. The only question in her case is whether relief in addition to damages is appropriate. *See id.*

On appeal, Giles asks that her claim for injunctive relief be dismissed. However, she continues to seek a declaratory judg-ment. Whether declaratory relief is necessary and appropriate to prevent future violations of constitutional rights is a matter to be considered in the first instance by the district court. We therefore remand Giles's claim for declaratory relief for consideration in light of the policies expressed in *Lyons* and *Gonzales.*

REVERSED and REMANDED.