567 F.Supp. 476 (1983)
MOUNTAIN STATES LEGAL FOUNDATION, on behalf of its individually named members, and Charles H. Maher, Jr., an individual resident of the City and County of Denver, Plaintiffs,
v.
CITY AND COUNTY OF DENVER, a municipal corporation; Mile Hi Cablevision Associates, Ltd., a limited partnership composed of Daniels and Associates Partners Limited; American Television and Communications Corporation, a Delaware corporation; Mile Hi Cablevision, Inc., a Colorado corporation, Defendants.
Civ. A. No. 82-C-1738.
United States District Court, D. Colorado.
July 27, 1983.
*477 William H. Mellor III, Alison D. Ling, Clint Bolick, Mountain States Legal Foundation, Denver, Colo., for plaintiffs.
Max P. Zall, City Atty., Andrew L. Weber, Asst. City Atty., William C. McClearn, Joseph W. Halpern, Elizabeth A. Phelan, Holland & Hart, Denver, Colo., for defendants.

ORDER
CARRIGAN, District Judge.
On May 24, 1982, the Denver City Council awarded Mile Hi Cablevision Associates, Ltd. a fifteen-year permit to construct, install, and operate a cable television system in the City and County of Denver, Colorado (city of Denver). Plaintiff Mountain States Legal Foundation filed a complaint against the city on October 18, 1982, claiming that this permit and subsequent contract (permit and contract) violate the First and Fourteenth Amendments to the United States Constitution. An amended complaint filed on November 1, 1982, added Charles H. Maher as a co-plaintiff.
Defendants moved to dismiss the complaint, asserting that the plaintiffs lack standing to litigate these claims, and, even if they have standing, that I should decline to act because of the abstention doctrine. The issues raised by this motion have been thoroughly briefed and ably argued.
For purposes of this motion to dismiss, I must assume to be true all material facts alleged in the complaint and must construe the pleadings in the plaintiffs' favor. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 109 n. 22, 99 S.Ct. 1601, 1613 n. 22, 60 L.Ed.2d 66 (1979); Warth v. Seldin, 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). In ruling on this motion to dismiss for lack of standing, I express no opinion on the merits of this First Amendment challenge to the permit and contract.

I. Parties and Background.

Mountain States Legal Foundation (MSLF) is a non-profit, public-interest organization. MSLF sues on behalf of six of its members who are Denver residents and potential cable-television subscribers. It also sues on behalf of its community organization member, Citizens for Open Cable (CFOC), which opposes any cable television monopoly. Plaintiff Charles H. Maher, Jr. sues as an individual Denver resident and potential cable-television subscriber alleging that he has been injured by the permit and contract.
Defendants are Denver and four business entities. One of the latter, Mile High Cablevision Associates, Ltd., is a limited partnership comprised of the three other partnership or corporate defendants. These four defendants will be referred to, collectively, as "Mile Hi."
During the 1970's, Denver began planning an extensive cable television system. Through the mid-1970's, a number of cable television proposals were submitted and evaluated, but all were rejected for failure to meet the City Council's standards. In February 1980, the City Council hired a consulting firm to help it decide what kind of cable television would best meet Denver's needs. The consulting firm subsequently asked the City Council to determine whether an exclusive franchise would be desirable. In response, the Council on June 3, 1980, declared by resolution that cable television in Denver should be operated under one franchise with one management.
In September 1980, Denver voters approved a City Charter Amendment authorizing *478 the Council to award a permit or permits for installation of cable television in the city. The Council then solicited bids from fifty-three cable television companies. Three companies submitted proposals, and on May 24, 1980, the Council granted Mile Hi a fifteen-year permit to construct, install, and operate a cable television system in Denver. The permit and contract provided for 220 cable channels  110 video channels and 110 data channels. The proposed cable system also included two-way communication capability.

II. Abstention.

The threshold issue is whether abstention is appropriate. Denver's Motion to Dismiss or, in the Alternative, for Summary Judgment, asked this court to abstain from proceeding, pending resolution of certain state court actions. None of those state court actions, however, raises a First Amendment challenge to the permit or the contract. Because abstention in circumstances such as here presented is not generally favored, and since none of the state court actions raises the First Amendment issue here presented, no principle of judicial comity or common sense would be served by abstention. The defendant's motion seeking abstention, therefore, is denied. See Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); Dombrowski v. Pfister, 380 U.S. 479, 489-99, 85 S.Ct. 1116, 1122-28, 14 L.Ed.2d 22 (1965).

III. Standing.

A. Basic Requirements of Standing.

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" or "controversies." Article III standing is one aspect of the case or controversy requirement. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100, 99 S.Ct. 1601, 1607-1608, 60 L.Ed.2d 66 (1979). If a plaintiff does not have Article III standing, there is no Article III case or controversy between that plaintiff and the defendant  even though a different plaintiff might have Article III standing to litigate the same claim. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).
For an individual, such as Maher, to have Article III standing, he or she must have a "personal stake in the outcome of the controversy." Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), quoting, Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). This constitutional requirement of a personal stake in the controversy has two prongs.
First, the individual must show that he or she has suffered or will incur some injury in fact that is both distinct and palpable. Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). The injury in fact need not be an economic loss; it may be an aesthetic injury. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Although the gravity of the injury required for Article III standing is unclear, it is settled that the injury must be personal to the plaintiff. An allegation that the plaintiff has a "mere interest" in the claim, or that the defendant's actions merely offend the plaintiff's sensibilities, is insufficient. City of Los Angeles v. Lyons, ___ U.S. ___, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); see Note, The Generalized Grievance Restriction: Prudential Restraint or Constitutional Mandate, 70 Geo. L.J. 1157 (1982).
Second, even if the plaintiff can prove an injury in fact, he or she also must prove a "fairly traceable" causal relationship between the defendant's challenged conduct and that injury. Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). This second prong of Article III's standing limitation requires a showing that granting the plaintiff the requested relief would redress the asserted injuries. Simon v. Eastern Kentucky Welfare Rights Organization, 426 *479 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-1926, 48 L.Ed.2d 450 (1976).
A membership association may have standing in its own right if it seeks judicial relief for injuries to the association. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). MSLF, apparently, does not here claim that it has been injured directly, in its status as an association, by Denver's award of the contract to Mile Hi. MSLF claims only that its members have been injured as individuals, and that this injury to its members provides MSLF with standing to represent their interests. See Mountain States Legal Foundation v. Costle, 630 F.2d 754, 767 (10th Cir.1980).
A membership association may have standing to represent its members' interests even if the organization itself has not been injured. Such an organization has standing to maintain an action in a representational capacity if three requirements are met. First, the members of the organization themselves must have individual standing to litigate the claim. Second, the interests the organization seeks to protect must be germane to its purpose. Third, neither the claim asserted nor the relief requested must require participation in the suit by the individual members. Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977); NCAA v. Califano, 622 F.2d 1382 (10th Cir.1980).
Even if a plaintiff has Article III standing to litigate a claim, statutory and judicial prudential limitations on standing may render the claim non-justiciable. See Valley Forge College v. Americans United, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Comment, 56 Notre Dame Law. 546 (1981). Defendants do not contend that there are any statutory limitations on these plaintiffs' standing. Defendants argue, however, that even if the plaintiffs meet the Article III requirements discussed above, prudential limitations on standing render their assertion of this claim non-justiciable. See Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

B. Plaintiffs' Alleged Injury in Fact and Redressability.

In their effort to satisfy the "injury in fact" requirement, the plaintiffs assert three distinct injuries. First, they claim that the contract requires Mile Hi to provide some broadcasts that will not be widely viewed, and therefore subscribers will be forced to pay higher fees to subsidize these less popular broadcasts. Second, they assert that Denver has granted Mile Hi a de facto fifteen-year exclusive permit, thus creating a monopoly that violates the plaintiffs' First Amendment rights to receive cable service from other willing and able cable television providers. Third, they claim a future injury, asserting that the contract will allow Denver to regulate the content of future broadcasts. Plaintiffs claim that this possible or potential regulation of expression violates their First Amendment rights.
Plaintiffs further contend that their asserted injuries will be redressed by this court holding that the contract violates the First Amendment. They argue that, if the contract is held unconstitutional, other cable television companies will enter the Denver market. This posited competition, they assert, would decrease cable-television subscription fees and increase the breadth of programming. Furthermore, the plaintiffs argue that Denver's "excessive control" over the content of ideas that may be expressed through cable television would be removed if the contract were held unconstitutional.

C. Standing Issue Rationale.

The general standing analysis required by the United States Supreme Court has been delineated in numerous decisions. See Valley Forge, supra; Duke Power, supra; Sierra Club, supra. Application of the analysis to the facts of a particular case, however, is a difficult task. The Supreme Court noted in 1970 that, "Generalizations about standing to sue are largely worthless as such." *480 Data Processing Services v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).
The first "injury in fact" claimed by the plaintiffs, anticipated higher cable subscription rates attributable to requiring a wide variety of programming, is shared by all potential customers who might subscribe to cable television. This potential injury is a generalized grievance which, if it occurs at all, would be borne by all Denver cable subscribers. No one of the plaintiffs will bear any greater burden from high subscription rates than any other cable subscriber. Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); Note, The Generalized Grievance Restriction: Prudential Restraint or Constitutional Mandate, 70 Geo.L.J. 1157 (1982).
Furthermore, the plaintiffs have not satisfied the second prong of the standing requirement. They have not stated, and obviously cannot state, how much the subscription rates would decrease, if at all, were other cable companies allowed to compete. Cable-television competition depends not on this court's remedial orders but on the unforeseeable, uncontrollable and uncertain business decisions of cable-television companies which are not parties here and, indeed, may not even exist. Thus I find and conclude that this claimed "injury" is wholly speculative and not particularized to any of these plaintiffs.
The second "injury in fact" alleged by the plaintiffs is that Denver has impermissibly limited the number of cable companies. MSLF claims that the permit and contract grant Mile Hi a "de facto" exclusive franchise, yet MSLF does not state what section(s) of the permit and contract allegedly grant Mile Hi this exclusive franchise. In reviewing the documents, I find no provision in either the permit or the contract which grants Mile Hi an exclusive franchise.
Indeed the plaintiffs allege that no other cable companies have yet been granted the right to compete with Mile Hi, but I decline to base a fact finding on speculation that Denver will never grant any cable competitor the right to compete with Mile Hi. Nothing precludes Denver from ever granting a franchise to another cable company or combination of companies. The permit and contract grant Mile Hi a right for only fifteen years. That is a relatively short span in the life of a city. At its conclusion, another company or consortium may well succeed to Mile Hi's position.
Further, the plaintiffs have not persuaded me that there would be any significant competition among cable television companies even if Denver were to give all comers carte blanche to provide cable television service in Denver. Out of fifty-three cable companies invited to bid, only three even submitted proposals. There is no evidence that the two providers whose proposals were rejected still desire to provide cable service in Denver. If they do, they, not these plaintiffs, are the parties with standing to litigate their rights. They should not be foreclosed by having their rights litigated by these plaintiffs.
Third, the plaintiffs allege that Denver will have the right to control, and in effect censor, the content of some cable broadcasts. Although the plaintiffs raise the specter of future governmental control, they do not allege that Denver has yet attempted to regulate cable broadcasts or has the slightest interest in doing so. I hold that this alleged "injury" is remote, speculative, and not ripe for judicial decision. Epperson v. Arkansas, 393 U.S. 97, 109, 89 S.Ct. 266, 273, 21 L.Ed.2d 228 (1965); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). If Denver ever should attempt to regulate, censor, or impose unconstitutional restraints on the content of broadcasts, that will be the time to litigate the constitutionality of those efforts, and hopefully the Colorado state courts and this court will still be open for business and vigilant in defending the First Amendment.
*481 I find and conclude that neither the individual MSLF members nor Charles H. Maher, Jr., has standing to litigate this claim. Since I have held that the individual MSLF members do not have standing, it follows that I find and conclude that MSLF, as an association, does not have standing. Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977).
I briefly make two additional observations. I already have found and concluded that the plaintiffs lack Article III standing to litigate these claims. Therefore, I need not consider prudential limitations on standing.
I also note that the plaintiffs allege that the "emergency override" provision in the permit and contract violates the plaintiffs' Fourth and Ninth Amendment rights. The emergency override provision gives Denver the ability simultaneously to override all cable audio broadcasts in the event of an emergency. Defendants argue that the plaintiffs do not have standing to pursue this claim. For the reasons already stated in the discussion of standing to litigate the First Amendment claim, I find and conclude that the plaintiffs do not have standing to litigate these Fourth and Ninth Amendment claims.
Accordingly,
IT IS ORDERED that the defendants' motion to dismiss for lack of standing is granted. The complaint and action are dismissed without prejudice. Each party shall bear his or its own costs.